## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **TIMEX LICENSING CORP.,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **3:07-cv-01731 (VLB)** |
| **ADVANCE WATCH CO. LTD.,** | : | |
| **Defendant.** | : | |
| | : | **March 27, 2009** |

### MEMORANDUM OF DECISION GRANTING PLAINTIFF'S MOTION FOR A PREJUDGMENT REMEDY AND DISCLOSURE OF ASSETS [Docs. #37, 38]

Before the Court are cross-motions for a prejudgment remedy and disclosure of assets. This action arises out of a licensing agreement between the plaintiff Timex Licensing Corp.[1] ("Timex") and the defendant Advance Watch Co. ("Advance"). Timex has moved for a prejudgment remedy pursuant to Conn. Gen. Stat. § 52-278a et seq. and disclosure of assets on its claim for minimum royalties due from Advance under the licensing agreement. Advance has also moved for a prejudgment remedy and disclosure of assets, asserting counterclaims for breach of the licensing agreement, tortious inference with existing and prospective business relations, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §42-110(a) et seq. and the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 35-50 et seq. The Court held four days of hearings on these motions on November 20, 2008, November 21, 2008, November 24, 2008, and December 18, 2008.

---

[1] Timex Licencing Corporation's parent company, Timex Corporation, is not a party to this case.

**<u>Facts</u>**

For the purpose of deciding the motions for a prejudgment remedy only, the Court makes the following findings of fact based on the testimony offered and the exhibits admitted during the four days of hearings. Such findings of fact are not established for any other purpose, including trial or summary judgment.

The plaintiff, Timex Licensing Corporation, is a subsidiary of Timex Corporation. Timex Licensing Corporation does not manufacture or sell Timex-branded products. Advance Watch Company designs and sells watches and clocks. Advance and Timex have a long relationship in both the clock and watch industries. In 1994, Timex and Advance first entered into a licensing agreement. The Amended and Restated License Agreement at the center of this dispute dates to June 2003 and concerns clock sales only. Under the agreement, Timex licensed its trademark to Advance in return for guaranteed minimum royalties and "earned royalties" as a fixed percentage of sales earned above the minimum royalty threshold. Advance did not manufacture Timex-branded clocks, but designed, marketed, and distributed the clocks. Under the terms of the licensing agreement, Advance was required to send quarterly reports disclosing its sales, prices, and other data to Timex. Timex in return was required to keep such data confidential. The license was non-exclusive in that Timex could license its trademark to be used by any designer or manufacturer. However, from 1994 until 2005, Timex did not do so.

Advance contracted with factories based in China to manufacture clocks

2

which Advance then distributed to North American retailers. Most of Advance's customers were large mass-market retailers such as Wal-Mart, Target, and K-Mart. Advance had two different supply models: direct import and fulfillment. Under the direct import model, Advance transferred ownership of the clocks to the retailer at the point of shipment, usually in China. Under the fulfillment model, the clocks were shipped to warehouses owned by Advance, and the retailer took ownership of the clocks at the warehouse or their own store.

In 2003, while Timex Corporation and Advance still had an important relationship in the watch business, the secondary clock business was not thriving. From that time on, Advance never acheived more than 60% of its minimum sales required under the licensing agreement. The market also changed. The biggest clock sellers, including Wal-Mart, were selling fewer branded clocks and selling more store-branded or generic clocks. These sales were often made by a direct contract between Wal-Mart and Chinese factories, which cut out both Timex and Advance.

Until March 2004, the president of the clock division at Advance was Rusty Dillingham. Until December 2004, Joe Kurelic was the national sales manager for Advance. Both left Advance to work for Chinese clock manufacturers. In February 2005, Steve Bolin became president of the Advance clock division.

In March of 2005, Helen Prial, the vice president responsible for the licensing division at Timex and the supervision of the licensing agreement between Timex and Advance, proposed a new business plan to her superiors at

3

Timex Corporation. Under the terms of that plan, Timex would work with Dillingham and Kurelic, who were then employed by Centreway, a factory manufacturing Timex-branded clocks for Advance, to directly sell clocks from Centreway to the ultimate retailers, bypassing Advance. Advance asserts that Kurelic had a non-competition agreement with Advance which would have barred the implementation of this plan. However, the testimony about the non-competition agreement was inconclusive, and no non-competition agreement has been produced.

In March, Joe Santana, the president of Timex Corporation, tentatively approved Helen Prial's new plan, including the termination of the Advance license. Around this time, Dillingham moved from Centreway to Litech, another manufacturer of Timex-branded clocks. Prial attempted to move forward with her business plan using Litech as the eventual manufacturer of Timex-branded clocks for direct import.

In April 2005, Bolin met with Prial for the first time. He proposed a number of new clock designs and suggested that after tooling in China, the clocks could reach the market by the fourth quarter of 2005. In May 2005, based on his meeting with Prial, Bolin presented a new business plan to Prial. Bolin proposed to fly to Hong Kong to place orders with Litech and Centreway for new tools to manufacture the clocks.

On July 8, Timex entered into a licensing agreement with Litech wherein Litech would manufacture Timex-branded clocks for direct import to mass-market

4

retailers, including major Advance customers.

On July 13, 2005, Prial called Bolin on the telephone. The conversation lasted 10 minutes or less. Prial told Bolin that he should not travel to Hong Kong because Timex had decided to follow a different business strategy and the licensing agreement would be terminated at the end of the year. Bolin's testimony varied between characterizing Prial's statement as "the license will be terminated at the end of the year," "the license would be terminated at the end of the year" and "the license is terminated at the end of the year." Prial testified that she did not want Advance to expend the money on tooling because the licensing agreement would be terminated at the end of the year. The licensing agreement expired by its terms at the end of 2006. Bolin testified that he took this conversation to mean that the license was terminated. However, his testimony was not entirely credible. He testified that he still believed that Advance could sell Timex-branded clocks through the end of 2005. He testified that Advance continued to sell Timex-branded clocks until August, 2006.

On August 2, 2005, Jennifer Brown, an employee at Timex Canada, an affiliated company that purchased Timex-branded clocks from Advance, wrote Prial to ask about the status of Advance's license with Timex. Prial wrote that the license was not yet terminated so Timex Canada should order from Advance whatever stock they needed. Prial then noted that there was a new license with Litech, that prices with Litech would be lower, and that nobody knew of the new license yet except the buyer at Wal-Mart. She indicated that in early 2006, orders

should go to Litech. This was consistent with Prial's prediction that Advance's license would be terminated at the end of 2005.

In August 2005, Prial began sending spreadsheets to Dillingham containing Advance's sales volume and wholesale prices by purchaser. She sent three different versions of the spreadsheet through October 2005 containing slightly different data. Prial questioned Dillingham about how the Timex clocks that Litech produced would compare on price with the Timex-branded clocks Advance ordered for production. Prial anticipated that Litech would sell Timex-branded clocks via direct import, and Timex would use its own sales force to fill domestic fulfillment orders. However, Prial's superiors at Timex Corporation never gave final approval of the Timex sales force plan and it was not actually implemented.

Advance paid minimum royalties through the second quarter of 2005 and continued to sell Timex clocks. When the third quarter royalty payment was due, executives at Advance, angry about Timex' plan to terminate their license, determined not to pay any royalties, though Bolin argued for paying royalties only as a percentage of Advance's actual sales. Advance also began using a proprietary Elgin trademark on clocks that it contracted for production. The Elgin clocks were, if not identical, very comparable to clocks it had previously sold with a Timex trademark.

Throughout the fall of 2005 and spring of 2006, Timex and Advance continued to discuss the future of the licensing agreement. Advances sales were strong until February 2006, when they dropped considerably. During this time,

6

both Timex and Advance employees referred to the licensing agreement as still in force. In April 2006, Timex sent a termination letter to Advance stating that it was terminating Advance's license due to Advance's failure to pay minimum royalties. Timex and Advance then entered into a sell-off agreement which allowed Advance to sell its remaining inventory of Timex clocks, and Advance paid some back royalties as a percentage of its sales. Advance no longer sells Timex-branded clocks.

## Discussion

Before issuing an order for a prejudgment remedy, the Court must hold an adversarial probable cause hearing. "The probable cause hearing is not a full-scale trial on the merits." Doe v. Rapoport, 80 Conn. App. 111, 116 (Conn. App. 2003) "The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim . . . .[T]his weighing process applies to both legal and factual issues . . . . In addition, the trial court has the responsibility, after the adversarial evidentiary hearing, to consider not only the validity of the claim but also the amount that is being sought." Giordano v. Giordano, 39 Conn.App. 183, 206, 664 A.2d 1136 (1995). "The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a [person] of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." Morris v. Cee Dee, 877 A.2d 899, 905 (Conn. App. 2005) "[P]robable cause for purposes of the [prejudgment remedy] statutes is a flexible common sense standard that does

7

not demand that a belief be correct or more likely true than false." <u>Fischel v.</u>
<u>TKPK, Ltd.</u>, 34 Conn.App. 22, 24, 640 A.2d 125 (1994).

### Timex' Breach of Contract Claim

Timex alleges that Advance failed to pay minimum royalties owing under
the licensing agreement. At the hearing on its motion for a prejudgment remedy,
Timex and Advance stipulated to the amounts owing under the licensing
agreement. Timex estimates that with attorney's fees and interest, it will receive a
judgment of $3,695,695.23, without taking into account set-offs or counterclaims.
The Court concludes that Timex has met its probable cause burden to establish a
likely recovery on its breach of contract claim. However, the Court must next
consider Advance's counterclaims before determining the amount Timex is likely
to recover.

### Advance's Breach of Contract Claims

Advance argues that Timex materially breached the licensing agreement in
two ways, excusing Advance from further performance under the licensing
agreement. First, Advance argues that Prial's statements to Bolin regarding the
continuation of the licensing agreement constitute a material breach of the
licensing agreement. Second, Advance argues that Timex breached the Licensing
Agreement by disclosing Advance's confidential information to Litech.

The licensing agreement provided a number of grounds for termination.
These included a failure to meet minimum sales targets, failure to make royalty
payments, or the unauthorized sale of licensed products. Advance argues that

8

Timex breached the contract by orally informing Advance that the contract would be terminated because Timex had decided on a different business model. Timex argues that even if Prial had intended to terminate the contract, which it argues she did not, any termination would have been required under the terms of a contract to be in writing. "A contract requirement that the notice of termination be in writing will not be strictly construed, however, when the evidence unequivocally establishes that the plaintiff received oral notice of termination." B. Finder Associates v. Coldform, Inc., CV03052375S 2005 WL 1331811 *2 (Conn. Super. May 5, 2005). The Court concludes that Prial did not intend to terminate the contract, and Bolin did not perceive it to be a termination of the contract. Advance did not immediately cease performing under the contract; it continued to sell Timex-branded clocks and paid some royalties. Timex did not cease performing under the contract either, inasmuch as the only performance required under the contract was the continued license of Timex' intellectual property. However, even if the Court credits Advance's theory that the oral form and lack of stated cause was a breach, it would not profit Advance.

As in B. Finder Associates, cited by Advance, the supposedly injured party would have suffered no damages from the improper form and notice of the termination. Advance would not have been better served by written notice, and would have suffered no direct damages from termination. It is undisputed that Advance was not in compliance with the minimum sales figures of the contract, and had never, in fact, been in compliance. Under the terms of the contract,

**9**

Timex could have rightfully terminated Advance at any time. Under the termination provisions of the contract, termination on any ground was without prejudice to any other rights or remedies. Bolin testified that he knew that Advance was not meeting its sales targets. Therefore, the lack of stated cause for termination would have caused no damages because Advance knew that there was proper cause for termination. Advance could suffer no damages from improper termination of a contract that it had been in violation of since 2003.The Court concludes that the phone call from Prial to Bolin does not present a defense to Advance's non-payment of the royalty minimums.

Advance asserts a second breach of contract claim. It argues that Prial's disclosure of Advance's confidential information to Dillingham constituted a material breach of the contract. The contract provides that "[a]ll information disclosed by a disclosing party to a receiving party . . . shall be deemed 'Confidential Information' unless such information: (a) is known by the receiving party prior to receipt by the disclosing party . . . ." [Plaintiff's Ex. 3] Prial testified that she did not believe that the information she disclosed to Dillingham was confidential because of Dillingham's long experience in the clock industry, including at Advance. She testified that she believed that his knowledge of the input prices and margins gave him the ability to independently produce the data she sent him. The Court does not credit this testimony; Dillingham had not worked for Advance for more than a year and a half at the time he received the data. He may have had a general idea of the numbers, but could not have known

the precise figures. Evidence was presented that some of the prices had doubled in the time period since Dillingham left Advance. Some of the clocks listed in the reports were not sold by Advance at the time Dillingham worked there. Therefore, Prial's disclosure of Advance's information to Dillingham constituted a breach of the licensing agreement, supporting a claim for damages.

A material breach relieves the injured party of a duty to further perform under a contract. Connecticut has adopted the Restatement in determining whether a breach of contract is material. Bernstein v. Nemeyer, 570 A.2d 164 (Conn. 1990). Section 241 of the Restatement (2d) of Contracts provides:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports will the standards of good faith and fair dealing.

Connecticut courts analyze whether a breach is material to the subject matter of the contract as a whole or merely incidental, i.e., susceptible of remedy by money damages or some other proceeding. See 669 Atlantic Street Assc. v. Atlantic-Rockland Stamford Assc., 682 A.2d 572 (Conn. App. 1996). The reasoning of 669 Atlantic Street is instructive in this case. The trial court found that the parties had entered into a sale-leaseback, where the plaintiff, the vendor/lessor, agreed to

11

indemnify the defendant for certain environmental site conditions and perform a site assessment. The plaintiff never made the site assessments and remained on the property after the end of the lease. The trial court found, and the appellate court affirmed, that this was not a material breach of the sale-leaseback agreement because the plaintiff remained liable for the environmental conditions and the defendant never moved for repossession. The Court reasoned that the defendant was not deprived of the benefit it reasonably expected because it retained ownership of property for which someone else was liable for environmental cleanup, and also held that the defendant should have moved for summary repossession if it wished to discontinue the exchange of performances.

In this case, the primary benefit which Advance expected from the licensing agreement was its profitable use of Timex' intellectual property. This benefit would have been undermined by Timex enabling Litech to undercut Advance's prices. However, the evidence presented does not show that this occurred. The Timex sales force fulfillment plan was never implemented. There was no evidence that Litech's direct import sales undercut Advance's direct import sales. On the contrary, Advance's sales increased through the end of 2005 and Advance admits that it did not suffer losses until 2006.  Thus, as in 669 Atlantic Street, the injured party continued to behave as though the contract were in place by accepting the benefit of the contract, which for Advance was the license to sell Timex clocks. While Dillingham had the information necessary to undercut Advance's sales, any competing sales would have been made for a

**12**

period after all of the parties anticipated that Advance's license would have been terminated. That Timex did not terminate Advance's license for failure to pay royalty minimums or achieve minimum sales targets until April 2006 was a result of Timex' indulgence, Advance's repeated requests, and Timex Corporation's need to preserve the watch business relationship with Advance. Further supporting Timex's argument that it did not intend to have Litech compete with Advance but rather replace Advance after Advance's termination is Timex' instruction to Advance's customers that they should order from Advance throughout 2005, though Litech already had the capacity to fill direct import clock orders in 2005. Prial's discussions with Wal-mart regarding Litech's anticipated lower prices were an honest forecast for 2006 based on all parties' expectation that Timex would terminate the license at the end of 2005. After 2005, the parties entered into negotiations to allow Advance to continue to sell off its remaining inventory of Timex clocks.

Advance's performance cannot be excused for a time period in which it retained its licensing rights through Timex' indulgence. It would be unjust to allow Advance to receive the benefit of Timex' licensing rights during a time period in which it was paying no royalties, and still excuse Advance's performance of its obligations. Examination of Litech's pricing decisions in the time period immediately following its receipt of Advance's confidential information should allow for the calculation of Advance's actual damages from Timex' breach, and Advance will thus be adequately compensated.

13

The remaining factors of the materiality analysis are either neutral or support Timex' position. Timex and Advance are no longer in business together, and thus there is no way to cure either party's breach outside of money damages. The intentional disclosure of Advance's confidential information to Advance's competitor is beyond any notion of fair dealing, but Advance's hands were not entirely clean. Advance had already determined that it would cease performing under the contract for reasons unrelated to the release of its information, which was not known by Advance until discovery in this litigation. Advance had no bona fide reason to cease performing at the time it ceased performing. As discussed above, while Advance was dismayed that Timex had indicated that it would soon terminate the licensing agreement and had licensed a competitor, Advance knew that Timex had a right to do so. Therefore, the Court finds that Timex' disclosure of Advance's confidential information was not a material breach. Advance has no defense to non-performance. Its remedy for Timex' breach will be money damages in the amount of lost profits if it can show that Litech used Advance's confidential information to undercut Advance's prices or negotiate with Advance's customers.

### Advance's Tortious Interference with Existing and Prospective Contractual Relations Claims

Advance argues that Timex tortiously interfered with its existing and prospective contractual relations by 1) telling its customers that they should buy Timex-branded clocks from Litech instead of Advance and 2) working with

Dillingham and Kurelic in violation of their non-competition agreements. "The essential elements of such a claim include, of course, the existence of a contractual or beneficial relationship and that the defendant(s), knowing of that relationship, intentionally sought to interfere with it; and, as a result, the plaintiff claimed to have suffered actual loss." Solomon v. Aberman, 196 Conn. 359, 365 (Conn. 1985) (internal quotations and citations omitted).

The interference must show fraud or "misrepresentation, intimidation, or molestation . . . or that the defendant acted maliciously." Solomon, 196 Conn. at 365. "[N]ot every act that disturbs a contract or business expectancy is actionable. A defendant is guilty of tortious interference if he has engaged in 'improper' conduct. The plaintiff is required to plead and prove at least some improper motive or improper means." (Internal citations and quotations omitted.) Golembeski v. Metichewan Grange No. 190, 569 A.2d 1157, 1159 (Conn. App. 1990) Connecticut has adopted the Restatement in determining whether interference is wrongful. Id. The Court considers :

> a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

Restatement (2d) of Torts § 767. Here, Advance argues that Timex interfered with its existing relationships with Wal-Mart and Timex Canada by informing them that Timex had granted a new license to Litech and that Litech's prices would be

lower. However, this information was truthful. A contract with Litech cut out a layer of margin and simplified the supply chain. Litech's prices were therefore bound to be lower than the prices Advance could offer after manufacturing with Litech. Timex also had the right to grant a license to Litech, because Timex' license with Advance was non-exclusive.

The licensing agreement with Advance clearly defined the interests of the parties and their expected behavior. Timex had an interest in seeing as many Timex-branded clocks sold as possible. Advance could sell clocks of whatever brand it wanted. Advance had failed to sell as many Timex clocks as it had promised under the agreement. Therefore, Timex had a legitimate interest in finding another licensee who could sell more Timex-branded clocks at a lower price, in order to keep Wal-Mart and other mass-market retailers from moving to their own store brands. Therefore, Timex did not act wrongfully in giving Wal-Mart and Timex Canada truthful information in order to promote its own legitimate business interests. See Restatement (2d) of Torts §§ 769-72.

Advance also argues that Timex tortiously interfered with its non-competition contracts with Dillingham and Kurelic. However, Timex never employed Dillingham or Kurelic. No evidence was introduced which would show the scope of the non-competition agreements. Prial testified that she never saw the non-competition agreements. No witness suggested that anyone at Timex ever saw the non-competition agreements. Therefore, the Court concludes that there is no probable cause to believe that Timex knew of a contract between

Advance and Dillingham or Kurelic, or that their actions would cause Dillingham or Kurelic to violate it. <u>See Solomon</u>, 196 Conn at 365. Therefore, the Court finds that Advance has not shown probable cause that a judgment will enter on its tortious interference with business relations claim.

<u>Advance's CUTSA Claim</u>

Advance argues that Timex' disclosure of Advance's confidential information to Litech violated CUTSA. CUTSA protects plaintiffs from misappropriation of their trade secrets. Misappropriation, in this context, is defined as:

> [D]isclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

> Conn. Gen. Stat. § 35-51(b).

A trade secret is:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, process, drawing, *cost data or customer list* that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

> Conn. Gen. Stat. 35-51(d). (Emphasis added).

Timex had a contractual duty to keep Advance's information a secret. Advance, by contract, limited the scope of the dissemination of its information and the use to which it could be put. Advance introduced evidence to show that potential

customers and competitors were not privy to its margin, wholesale, or volume data. A reasonable person would believe that these facts indicate that such information, in the hands of Advance's competitor, could be put to uses that would harm Advance. Therefore, for these reasons and the reasons stated above in finding a breach of contract with respect to Timex' disclosure Advance's confidential information, the Court concludes that Advance has shown probable cause that a judgment will enter in its favor on its CUTSA claim.

### Advance's CUTPA Claim

In determining whether a practice violates CUTPA, the Court "is guided by the criteria set out in the Federal Trade Commission's so-called cigarette rule: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise- in other words, it is within at least the penumbra of some common law, statutory, or other established concept of fairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons." (Internal citations and quotations omitted). Zulick v. Patrons Mutual Ins. Co., 287 Conn. 367, 378 n.11 (Conn. 2008).

CUTPA is non-formulaic. "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. Thus a violation of CUTPA may be established by showing either an actual

**18**

deceptive practice or a practice amounting to a violation of public policy. In order to enforce this prohibition, CUTPA provides a private cause of action to any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a prohibited method, act, or practice." (Internal citations and quotations omitted). Ramirez v. Health Net of the Northeast, Inc., 285 Conn. 1, 19 (Conn. 2008). Not every breach of contract will support a CUTPA claim. Lydall, Inc. v. Ruschmeyer, 919 A.2d 421, 428 (Conn. 2007) Neither is a CUTSA claim a per se violation of CUTPA. Id. at 247.

Advance argues that Timex violated CUTPA through its disclosure of Advance's confidential information to Litech and by informing its customers of Timex' new license and lower prices through Litech. However, the non-exclusive nature of the license indicates that the parties' interests were not fully aligned by contract. To some extent, they were competitors. Timex could license other parties to sell Timex clocks, and Advance could produce clocks for other parties. Therefore, Timex' report of the new Litech license to Wal-Mart and Timex Canada was competitive, but not unfairly so. However, with respect to Timex' disclosure of Advance's confidential information to Litech, the Court concludes that Timex' actions were unfair and anti-competitive. Advance entrusted its proprietary data to Timex for the purpose of assessing Advance's compliance with the licensing agreement, and for no other use. The disclosure of the confidential information was repeated and intentional, and therefore rises to the level of an unfair trade practice. The final element of CUTPA is that a person have suffered ascertainable

damage. While Advance did not present specific evidence of lost sales, the Court concludes that under the standard for a prejudgment remedy, probable cause, a reasonable person would believe that Advance suffered some actual damage from Timex' disclosure of Advance's trade secrets. Therefore, the Court concludes that there is probable cause that judgment will enter for Advance on its CUTPA claim.

## Attorney's Fees

Both parties argue that they are entitled to attorney's fees under the terms of the contract. The licensing agreement provides that the prevailing party is entitled to recover costs and fees. The Court interprets this provision to mean that in this circumstance, where each party asserts claims for damages, each party will be entitled to attorney's fees and costs for prosecuting successful claims, but not for defending against the opposing party's claims. The Court therefore grants each party a prejudgment remedy on the amount of attorney's fees sought, with the understanding that those projections include only fees related to the prosecution, and not defense, of this case.

The Court notes that Advance has advanced claims for damages predicated on several different sets of facts, however, the Court has found that only one, based on Prial's disclosure of Advance's confidential information, is likely to be successful. The Court believes that after this ruling, Advance will concentrate its litigation strategy, and thus incur attorney's fees, on this theory of this case, and not on its other claim scenarios. The Court thus grants Advance a

prejudgment remedy to secure the entire amount of attorney's fees claimed. Should Advance achieve judgment in its favor, it will have to demonstrate that its attorney's fees were incurred in the prosecution of successful claims, and not in defense or in the prosecution of unsuccessful claims.

### Advance's Damages

The Court concluded that Advance has established a probable cause to believe that judgment will enter on liability with respect to one of its breach of contract claims and its CUTSA and CUTPA claims, but that Advance has not established probable cause on its claims predicated on the licensing of Litech or Prial's termination warning to Bolin. At the hearing, Advance presented its damages claim without apportioning damages by count. Bolin calculated Advance's damages based on the difference between the profits he projected in April 2005 and the actual results from 2005-2006. Setting aside the inherent unreliability of a forecast set a year and a half out by an executive with less three months on the job and an incentive to paint Timex a rosy picture of upcoming sales, the profit model omitted significant costs. Specifically, it did not include any of the costs of developing and marketing the new clocks that Bolin expected to improve Advance's declining market share.

Additionally, the method Advance used to calculate its damages merely ascribed any loss Advance suffered to Timex' actions without showing causation or allowing for any outside causes such as the generally declining market for branded clocks. Bolin did not take into account the possibility that Timex would

21

grant a competitor a license or that Timex would terminate Advance's license due to Advance's failure to meet minimum sales. Nor did he take into account any offsetting gains from Advance's promotion of the Elgin clock brand.

Bolin admitted that under his calculation, Advance did not suffer any losses for 2005, only 2006. In 2006, it appears that the damages calculation includes lost business as a result of Timex' termination. However, section 15.3 of the licensing agreement provides:

> Upon the expiration or termination of this Agreement, Licensee shall not be entitled to termination payments, compensation, reimbursement, or damages on account of any loss of prospective profits on anticipated sales or on account of expenditures . . . including, without limitation, damages claimed by reason of Licensee's reliance upon further continuance of this Agreement.

Therefore, the Court concludes that Advance is only entitled to a prejudgment remedy securing damages directly arising out of Prial's disclosure of Advance's confidential information, and yet there is no way for the Court to estimate what those damages would be. The Court cannot separate the effects of the disclosure of Advance's confidential information from the effects of Timex' legitimate termination of the licensing agreement, Advance's decision to promote a second brand of clock, and the declining branded clock import market.

> "[I]n an application for a prejudgment remedy, the amount of damages need not be determined with mathematical precision . . . . A fair and reasonable estimate of the likely potential damages is sufficient to support the entry of a prejudgment attachment . . . . Nevertheless, the plaintiff bears the burden of presenting evidence which affords a reasonable basis for measuring her loss." (Internal citations and quotations omitted)

22

**Rafferty v. Noto Bros. Construction**, 68 Conn.App. 685, 693 (Conn. App. 2002).

The Court has no method of computing damages for Advance's claims predicated on the disclosure of its confidential information, as there is no evidence before the Court that Advance lost any sales specifically due to the disclosure of its confidential information. The evidence instead suggests that Litech's lower costs of production and streamlined business model would have ensured that their prices were always lower than Advance's prices. Price-conscious mass-market retailers would have migrated to Litech whether or not Litech exploited Advance's confidential information. The Court presently has no way to determine whether Litech was able to price its clocks within a margin that ensured that retailers would choose it over Advance where it could not have done so without Advance's data.The Court will not speculate as to what Advance could prove at trial and does not grant Advance a prejudgment remedy to secure damages.

## Conclusion

The Court has found that Timex is entitled to a prejudgment remedy in the amount of $3,695,695.23 and Advance is entitled to a prejudgment remedy in the amount of $700,000 for its anticipated attorney's fees. Under Conn. Gen. Stat. § 52-278d(a)(2), the Court must consider counterclaims as set-offs. Therefore, Timex is entitled to attach $2,995,695.23 of Advance's assets.

Advance has argued that absent a showing of irreparable harm, the Court may not order Advance to bring its assets into Connecticut to satisfy a

23

prejudgment remedy. Timex has not argued otherwise, and there has been no suggestion that Timex would suffer irreparable harm. <u>See, e.g., Metal Management, Inc. v. Schiavone</u>, 514 F. Supp. 2d 227, 240 (D. Conn. 2007). Therefore, Timex' writ of attachment is limited to Advance's assets located in Connecticut. Accordingly, Advance is ordered to disclose to Timex within 30 days of the date of this order all interests or debts owing to it within Connecticut sufficient to satisfy the prejudgment remedy ordered.

IT IS SO ORDERED.


_____/s/_____

**Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut:  March 27, 2009.**